**Sidney HIRSHON, Appellant,**

v.

**UNITED ARTISTS CORPORATION,**
Appellee.

No. 13436.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 27, 1957.

Decided April 4, 1957.

Mr. Elliott I. Pollock, Washington, D. C., with whom Mr. William D. Hall, Washington, D. C., was on the brief, for appellant.

Mr. Fulton Brylawski, Washington, D. C., with whom Mr. William B. Wolf, Washington, D. C., was on the brief, for appellee.

Before WILBUR K. MILLER, BAZELON and BURGER, Circuit Judges.

BAZELON, Circuit Judge.

Appellant sued for damages for the infringement of his copyright on the song "London Bells Will Ring Again" by appellee's "Song From Moulin Rouge." This appeal is from an order granting summary judgment in favor of the appellee.

Appellant composed the music of "London Bells Will Ring Again" and his mother composed the words. On October 5, 1943, they secured a copyright on it in the name of the mother by registering a manuscript copy with the Library of Congress, as provided by § 11 of the Copyright Act of 1909, 17 U.S.C. § 12. On December 27, 1943, appellant and his mother entered into a contract with Joseph Carlton, purportedly a publisher, assigning to him their song "including the title, words and music thereof, and the right to secure copyright therein throughout the entire world, and to have and to hold the said copyright and all rights of whatsoever nature thereunder existing * * * for a period of three years from date of this contract." Thereafter, Carlton printed 2,500 copies of the song, each copy bearing the notice "Copyright 1944 by Joseph Carlton." About 2,000 of these copies were distributed to various persons in the music business. On August 1, 1953, appellant obtained from his mother an assignment of the 1943 copyright and recorded the assignment in the Copyright Office as provided by 17

U.S.C. § 30. Thereafter, as proprietor of that copyright, he brought this suit.[1]

Appellee's motion for summary judgment was grounded on the theory that appellant "is not the proprietor of a valid copyright in the work which he alleges to have been infringed." That theory is a composite of two contentions: (1) that appellant is not the proprietor of the copyright; and (2) that the copyright is invalid.

*The Proprietorship of the Copyright.*

■■ In support of the first contention, appellee argues that the contract with Carlton was an assignment to the latter of the 1943 copyright, so that appellant has no interest to complain of infringement. The contract does not expressly assign the 1943 copyright. Indeed, it does not even mention it. Appellee contends, however, that there was an assignment of *all* of the owners' rights in the song, so that the assignment carried with it the copyright. Since the contract shows on its face that it did not assign all of the owners' rights, we cannot accept appellee's contention. In the first place, while a copyright runs for 28 years, with a right to renew for an additional 28 years, the rights conveyed to Carlton by this contract were for a term of only three years. Moreover, the licensing powers Carlton received under the contract were narrowly circumscribed by a series of rights reserved to the assignors.[2] If the assignors did not assign *all* of their rights to Carlton, we can imply no assignment of the copyright, for the copyright proprietor "may transfer the legal title to his copyright only in totality; the copyright may not be split up and partially assigned as to the various rights encompassed therein." Finkelstein, The Copyright Law—A Reappraisal, 104 U.Pa.L. Rev. 1025, 1060 (1956).[3]

*The Validity of the Copyright.*

■■ The contention that the copyright relied on is invalid rests on the statutory requirement that the notice of copyright appearing on copies of a published musical work must correctly state the name of the registered copyright proprietor and the year of the copyright. 17 U.S.C. § 19. Since appellant's mother remained the registered proprietor of the copyright despite the contract with Carlton [4] and since the copyright was secured in 1943, it is claimed that publication of the song with a notice reading

1. The song allegedly infringing the copyright was featured in the motion picture "Moulin Rouge," distributed by appellee in 1952. The issue of infringement, though argued by appellee here, was not considered below and is not before us on this appeal.

2. Paragraph 4(m) of the contract provided:
"The Publisher shall not, without the written consent of the Writer(s) in each case, give or grant any right or license (a) to use the title of the musical composition, or (b) for the exclusive use of said composition in any form or for any purpose, or for any period of time, or for any territory, or (c) to give a dramatic representation of the said musical composition or to dramatize the plot or story thereof, or (d) for a vocal visual rendition of said composition in synchronization with a motion picture."

3. "In relation to the right to sue for an infringement, a copyright is an indivisible thing, and cannot be split up and partially assigned either as to time, place, or particular rights or privileges, less than the sum of all the rights comprehended in the copyright [sic]. Certainly the statute authorizing assignments of copyright contains no recognition of such partial assignments. Of course, such exclusive rights may be granted, limited as to time, place, or extent of privileges which the grantee may enjoy; but the better view is that such limited grants operate merely as licenses, and not as technical assignments, although often spoken of as assignments." M. Witmark & Sons v. Pastime Amusement Co., E.D.S.C.1924, 298 F. 470, 474–475, affirmed 4 Cir., 1924, 2 F.2d 1020; Elliot v. Geare-Marston, Inc., D.C.E.D.Pa.1939, 30 F.Supp. 301, 306.

4. No assignment of the copyright to Carlton was recorded in the Copyright Office as provided in 17 U.S.C. § 30. The name of an assignee may be substituted as the proprietor in a copyright notice only if the assignment has been recorded. Id. § 32.

"Copyright 1944 by Joseph Carlton" rendered the copyright invalid and abandoned the song to the public domain.[5]

This contention depends initially upon an assumption that a notice of copyright was required to appear on the copies of appellant's song.[6] While such a notice is an indispensable part of the process by which copyrights of *published* works are secured, 17 U.S.C. § 10, appellant's copyright was obtained before publication, under 17 U.S.C. § 12, requiring merely the filing in the Copyright Office of an application and a manuscript copy of the song. Section 12 provides, however, that "where the work is later reproduced in copies for sale," the requirement of § 13 for deposit of copies will apply. That requirement is for the deposit of two copies "with the notice of copyright as provided in section 10 * * *." By § 10, the notice must "be affixed to each copy * * * published or offered for sale in the United States by authority of the copyright proprietor * * *." So the printed copies of appellant's song were required to bear a notice of copyright only if, under the circumstances revealed by the record, (1) they were "reproduced for sale" (§ 12) or "published or offered for sale" (§ 10); and (2) such reproduction or publication or offering was "by authority of" appellant's mother, who was the copyright proprietor at the time in question. Since it cannot be concluded from this record, beyond any issue of fact, that either of these conditions was satisfied, the summary judgment entered below cannot be sustained.

The terms "reproduced for sale" and "published" are apparently used interchangeably.[7] "Publication" is not defined in the Copyright Act. The Act defines "the date of publication" as "the earliest date when copies of the first authorized edition were placed on sale, sold, or publicly distributed." 17 U.S.C. § 26. That definition, however, "was an enactment to fix the date from which the copyright term should begin to run, and not a general definition of what constituted publication." Cardinal Film Corp. v. Beck, D.C.S.D.N.Y.1918, 248 F. 368; see also Patterson v. Century Productions, 2 Cir., 1937, 93 F.2d 489, 492, certiorari denied 1938, 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114. What constitutes publication, so as to validate or invalidate a copyright, must be determined, therefore, in each case by considering its facts in the light of the policy of the Copyright Act.[8]

A finding that a work has been published may have various effects. It may serve to destroy a common-law copyright, White v. Kimmell, 9 Cir., 193 F.2d 744, certiorari denied 1952, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357, or a statutory copyright secured under § 12, as is here contended. On the other hand, it may serve to validate a statutory copyright secured under § 10, where publication is a necessary precondition. Or it may invalidate a § 10 copyright where the alleged publication bears a defective notice of copyright. See Heim v. Universal Pictures Co., 2 Cir., 1946, 154 F.2d 480. From the results of the decided cases, the principle is discernible that

---

5. Mifflin v. R. H. White Co., 1903, 190 U.S. 260, 23 S.Ct. 769, 47 L.Ed. 1040; Group Publishers v. Winchell, D.C.S.D.N.Y.1949, 86 F.Supp. 573, 576; Baker v. Taylor, C.C.N.Y.1848, 2 Fed.Cas. page 478, No. 782; but cf. Advisers, Inc. v. Wiesen-Hart, Inc., 6 Cir., 1956, 238 F.2d 706.

6. If the statute requires no notice, an improper notice does not constitute a violation. Heim v. Universal Pictures Co., 2 Cir., 1946, 154 F.2d 480, 486.

7. Howell, The Copyright Law 94–95

(1942). See also 37 C.F.R. § 201.6(f) (1939).

8. The complete revision of copyright law effected by the Copyright Act of 1909 was designed to free authors from burdensome requirements and "afford greater encouragement" to them. Washingtonian Publishing Co. v. Pearson, 1939, 306 U.S. 30, 36, 59 S.Ct. 397, 400, 83 L. Ed. 470. Doubtful language in the Act is not to be read in a way to produce forfeitures of copyrights. Id., 306 U.S. at page 42, 59 S.Ct. at page 403.

it takes more publication to destroy a common-law copyright than to perfect a statutory copyright.[9] The late Judge Frank, in his recent opinion in American Visuals Corp v. Holland, 2 Cir., 1956, 239 F.2d 740, 744, after a most persuasive review of the decisions, articulated the principle as follows:

"Cases such as these indicate that, as we said above, the courts apply different tests of publication depending on whether plaintiff is claiming protection because he did not publish and hence has a common law claim of infringement—in which case the distribution must be quite large to constitute 'publication' —or whether he is claiming under the copyright statute—in which case the requirements for publication are quite narrow. In each case the courts appear so to treat the concept of 'publication' as to prevent piracy."

We think the authorities he cites and others warrant the more generalized observation that it takes more in the way of publication to invalidate *any* copyright, whether statutory or common law, than to validate it.[10]

██ We cannot conclude from the circumstances appearing on this motion for summary judgment that there was such general publication as to vitiate appellant's copyright.[11] All the record shows is that 2,500 copies of appellant's song were printed and that some $2,000 of them were distributed to broadcasting stations and professional musicians for "plugging" purposes, chiefly through Broadcast Music Incorporated, named on the copies as a licensing agent. Not a single copy was sold. No license or other permission was given to anyone to perform or otherwise use the song. Nothing was said or done, beyond the described distribution, to give any recipient of a copy the impression that he could make any use of it without first obtaining the proprietor's license through the stated licensing agent.

██ So far as appears from the record, this distribution was no more a general publication than the sending of samples to dealers for the purpose of enabling them to give orders. Falk v. Gast Lithograph & Engraving Co., 2 Cir., 1893, 54 F. 890, 893.[12] Appellee says there was a general publication here because the copies distributed were not labeled "Professional." There is no rule of law to that effect. If a trade custom is relied on, it must be proved. On this

9. "Publication which results in loss of common-law protection is not necessarily synonymous with publication necessary to secure statutory copyright. 'It will be harder to prove a divestitive than an investitive publication.' DeWolf, An Outline of Copyright Law 32 (1925)." Henn, The Quest for International Copyright Protection, 39 Cornell L.Q. 43, 51 n. 39 (1953).

10. See especially American Tobacco Co. v. Werckmeister, 1907, 207 U.S. 284, 28 S. Ct. 72, 52 L.Ed. 208; Heim v. Universal Pictures Co., supra, note 6; and Patterson v. Century Productions, 2 Cir., 1937, 93 F.2d 489, certiorari denied 1938, 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114.

11. See American Tobacco Co. v. Werckmeister, 1907, 207 U.S. 284, 299, 28 S.Ct. 72, 52 L.Ed. 208. A limited publication, as distinguished from one that is general "communicates the contents of a manuscript to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale * * *." White v. Kimmell, 9 Cir., 193 F.2d 744, 746–747, certiorari denied, 1952, 343 U.S. 957, 72 S. Ct. 1052, 96 L.Ed. 1357. "Clearly, if the publication is limited *both* as to the persons allowed to use the work and to the use which such persons may make of the work, a general publication does not occur." Nimmer, Copyright Publication, 56 Col.L.Rev. 185, 200 (1956).

12. In McCarthy & Fischer, Inc., v. White, D.C.S.D.N.Y.1919, 259 F. 364, 365, the court said:

"Only a publication of the manuscript will amount to an abandonment of the rights of the author and a transfer of them to the public domain. It was not such a publication to give the song to a limited number of artists to sing prior to the date of copyright. There is no evidence or probability that any of the copies were sold, or that they were given out for any purpose but a limited use by a few vaudeville artists."

See also Allen v. Walt Disney Productions, D.C.S.D.N.Y.1941, 41 F.Supp. 134; cf. White v. Kimmell, 9 Cir., 193 F. 2d 744, supra, note 11.

record summary judgment may not be granted.

■ Even if it were possible to conclude that there was a publication of appellant's song, we think there is an issue of fact as to whether the publication was "by authority of the copyright proprietor," at that time appellant's mother. It does not appear from the record that either appellant or his mother authorized Carlton to do anything more than circularize the trade for the purpose of stimulating interest in the song. Although appellant "acquiesced" in the form of notice of copyright Carlton had placed on the copies, both he and his mother "questioned it and [Carlton] said that was normal procedure." If it is to be found that there was an authorization of the particular kind of "publication" Carlton made,[13] it must be upon more evidence than is contained in this record.

Reversed and remanded for further proceedings.

WILBUR K. MILLER, Circuit Judge, concurs in the result.

13. Where the circumstances show consent by the copyright proprietor, publication of a work by a mere licensee with the licensee's name in the notice of copyright may work a forfeiture. See cases cited in Finkelstein, The Copyright Law—A Reappraisal, 104 U.Pa.L.Rev. 1025, 1030 n. 17 (1956).